PARHAM *v.* BRADBERRY.

(Division B. April 24, 1939.)

[188 So. 298. No. 33679.]

**Hindman Doxey,** of Holly Springs, for appellant.

Lester G. Fant, Sr. & Jr., of Holly Springs, for appellee.

Argued orally by **Hindman Doxey**, for appellant, and by **Lester G. Fant, Sr.**, and **Jr.**, for appellee.

**Ethridge, P. J.**, delivered the opinion of the court.

This is an appeal from a decree of the chancery court of Marshall county, overruling a motion to dissolve a temporary injunction. In 1913 W. B. Bradberry, the appellee, who was the complainant below, owned in fee simple a lot and building on the north side of the public square in Holly Springs, Mississippi. This lot was 44 feet wide, east and west, fronting on the public square, and more than 100 feet in depth, north and south, and is described as Lot No. 5 according to the plan of Holly Springs, in section 6, township 4, range 2, west. In 1913 Bradberry caused to be erected on this lot a two-story brick building, extending across the entire width of the lot, 44 feet east and west, and 100 feet north and south on the ground floor; the second story was of the same

width as the first, but extended northward from the front only 50 feet. The ground floor was designed for two separate stores, each approximately half the width of the building, which was divided by a 13-inch solid brick wall, which ran the entire length of the building, and the entire height of the building.

The second story of the building was designed for offices, to be reached by a stairway leading up from the public square at the front of the building. The prospective tenant of the store on the west side of the building preferred not to have an offset in his store. The stairs leading up to the second floor were therefore erected on the east side of the 13-inch wall. The treads of the stairway are 36 inches wide east and west, and it leads directly from the street to the second floor. A 3-inch rail up the stairway reduces its width to that extent. At the top of the stairs the hall runs north to the end of the building, where a window was placed, to afford light and ventilation. The hall is 38 inches wide, and like the stairway, is immediately east of the brick wall; and at the top of the stairs were placed doors, opening into the two suites of offices; and at the north end of the hall another door opened into a small washroom. The two doors at the head of the stairs provided the only entrance to the offices on each side of the hall, the brick wall providing the partition on the west side of the hall, while the partition on the east side was of laths and plaster.

Mr. Bradberry owned the entire building described above until June 23rd, 1919, when he conveyed the entire lot and building to H. A. Harris and Cecil Ross, the grantees taking the property as tenants in common, and giving a joint deed of trust to Mr. Bradberry as security. About the 3rd of July of that year Harris and Ross exchanged deeds, for the purpose of dividing the property in kind, the deed of trust to Mr. Bradberry being still unsatisfied. The deed from Ross to Harris, and that from Harris to Ross, both contained a provision with reference to the use of the stairway and hall for the benefit of the

offices on the west side of the dividing wall. From the deeds we quote the following, as bearing on the use of the stairway: ''And a perpetual, permanent and continuous right of way and easement 40 inches wide off of the west side of the east half of said lot No. 5 aforesaid for a stairway leading up from the street on the south of said lot to the hallway for ingress from and egress to the second story of the building on the said west half of said lot, the said stairway and hallway to be perpetually kept open and free for use for ingress and egress by me and the said Hamilton Harris, our tenants and assigns, all repairs needed for the upkeep and maintaining of said stairway and hallway to be borne and shared equally by me and the said Hamilton A. Harris. Should the building on the said east half of said Lot No. 5 be torn down or destroyed by fire or cyclone, and another building be erected on the said east half of said Lot No. 5 the said stairway and hallway are again to be restored as the same now are, with like conditions for ingress and egress to the said second story of the said west half of said Lot No. 5.''

Both deeds contained substantially this clause, with the parties to the deed, of course, being reversed as grantor and grantee.

Thereafter Ross conveyed his east half to Leibson and Richardson, but at the time of this conveyance the deed of trust in favor of Bradberry was still outstanding and unsatisfied. Leibson and Richardson were afterwards adjudged bankrupts, and the trustee in bankruptcy conveyed their interest in the building to Bradberry, the two bankrupts also executing to him a quitclaim deed, in the year 1921.

The deed of trust to Bradberry, securing the purchase money, had not been satisfied, nor had the purchase price been paid, when Bradberry received the title to the east half of the building, and agreed with H. A. Harris, who still owned the west half, that it should be a credit on the purchase price which had been jointly assumed

by Harris and Ross. Mr. Harris subsequently paid the balance of the purchase price, and on June 24, 1924, Mr. Bradberry satisfied the record of the deed of trust; continuing to own the east half of the building, while Mr. Harris owned the west half, both stores, and both suites of offices being occupied by tenants, as they had been from the time the building was completed.

In June, 1924, Harris conveyed his interest in the west side to J. T. Wade, with the easement as to the stairway and hallway, as means of ingress and egress to the offices on the west side of the building. Wade continued to rent the west side of the second story of the building as offices, installing a motion picture show on the ground floor, without disturbing the offices above, or the stairway on the east side of the wall. Later he leased his side of the building to Barnett-Coopwood, Inc., who operated a motion picture theater, and who, in turn, leased the building to C. E. Westbrook, by a lease dated June 7, 1938. By an arrangement between J. T. Wade and his lessees, Barnett-Coopwood, Inc., and C. E. Westbrook, the latter undertook to remodel the west side of the building into a more suitable place for the operation of a motion picture theater. It was contemplated by them that the entire building on the west side was to be used as such theater, and in order to do this it was necessary to raise the roof of the west side by building the 13 inch dividing wall to an increased height of about 6 feet, constructing a roof at that level.

In order to do this it was necessary for Westbrook to obtain permission from Bradberry, owner of the east side of the building. He failed to see him in person, and requested Mr. Coopwood, president of Barnett-Coopwood, Inc., to obtain the permission desired. Mr. Coopwood informed Mr. Bradberry of Westbrook's plan to cut the roof and extend the dividing wall to a new height in order to raise the roof of the west half of the building, and to flash the roof of the east side to the extension of the dividing wall, requesting his permission to carry out

the plan. Mr. Bradberry asked Coopwood whether it was intended to use the stairway and hall on the east side of the dividing wall as the entrance and exit for the balcony of the theater to be erected, to which Coopwood replied that according to the blueprints of the remodeling this was not the plan—that a new stairway was to be built on the west side to give access to the balcony, and that the doorway through the 13-inch dividing wall in the hall would be closed.

Thereupon permission was given, in accordance with this understanding. The roof was cut, the 13-inch wall was built to the new height, approximately 6 feet above its former level. The floor of the west side of the building was taken up, and replaced by a new floor at a lower level. The floor and ceiling joists of the second story were removed entirely, with all partitions on the west side of the building, the only part of the original building still remaining being the front wall; the west side of the building was practically a new building. Below the floor level of the second story a balcony extended from the south end of the building northward about forty feet; and from this balcony a ramp was built, leading to the door in the hall on the east side of the dividing wall, which had formerly been the entrance to the offices on the west side. The balcony had 165 seats, and the only entrance to it was the stairway and hall on the east side of the dividing wall. A ticket window was cut through the 13-inch wall at about the height of the second or third step of the stairway, from which to sell tickets to patrons.

All this was done by Mr. Westbrook after the roof had been cut and raised, after the conversation between Mr. Coopwood and Mr. Bradberry. The use of, or attempt to use, the stairway and hall on the east side of the wall, as the entrance to the balcony, represented a change in Mr. Westbrook's plans, the testimony showing that the original plan for remodeling called for the construction of a stairway to the balcony on the west side of the build-

ing, and that these plans were changed shortly before the completion of the building.

It was further shown in the testimony that if he had not changed the plan he could have had an entrance to the balcony without using the stairway and hall on the east side of the dividing wall.

Before the completion of the remodeling and rebuilding Mr. Bradberry noticed the opening cut in the dividing wall at the foot of the steps, and found that it was to be used as a ticket window; despite the assurance given him by Coopwood that the stairway and hall to the east of the dividing wall would not be used, Mr. Westbrook was so constructing the theater as to use the stairway and hall for entrance to the balcony. Mr. Bradberry protested to Westbrook, stating that he would not permit the stairway to be so used; to which Westbrook replied that he had spent too much money to stop then. Mr. Bradberry told him that unless he stopped, he would file a bill to enjoin him from using the stairway as an entrance. Mr. Westbrook asked him not to file suit then, as he was about to sell his theater, the prospective purchaser being Walter M. Parham, and Bradberry did not file suit at that time. Mr. Parham was informed of the controversy, and knew that Bradberry contemplated obtaining an injunction. In the conveyance subsequently executed by Westbrook to Parham it was agreed that should suit be filed, or any misunderstanding arise in regard to the use or conduct of the said theater, Parham was to assume all obligations to make settlement and adjustments with adjoining property owners, and to contest any suit which might be brought, relieving Westbrook of any further connection with, or responsibility for, the matter.

With this understanding, Parham bought the remodeled theater from Westbrook for approximately $25,000, and began operating it, using the stairway and hall as the entrance to the balcony, the door opening from the

hall into the balcony having been changed to open outward into the hall, instead of inward, as formerly.

There was some effort on the part of Bradberry and Parham to reach an agreement in regard to the use of the stairway and hall, Mr. Bradberry allowing its use for a while, to see whether it would prove to be unsatisfactory. After a few weeks Bradberry found it necessary to request Parham to discontinue such use, which the latter declined to do. Bradberry then filed his bill in the chancery court, to enjoin the use of his stairway and hall as an entrance to the balcony of the motion picture theater. On the hearing a preliminary injunction was granted, demurrer to the bill was overruled, and Mr. Bradberry executed a bond in the sum of $1250. On October 12, 1938, the respondents filed a motion to dissolve the temporary injunction, which motion was heard by agreement in vacation on October 14, 1938, at which hearing the above facts, in substance, were developed. Thereafter the court overruled the motion to dissolve the injunction, which was continued until further order of the court. There was no agreement that this hearing would be a hearing on the merits of the case.

This appeal is prosecuted from the action of the court in refusing to dissolve the temporary injunction.

Without going into the authorities in detail, we are of the opinion that the remodeling of the building, and the new use to which it was devoted, was such a change of conditions and understandings in regard to the use of the stairway and hall, and the cutting of an opening in the partition wall for a ticket window, as to take the situation out of the contemplation of the parties to the contract and deeds for a permanent, continuous easement in the stairway and hall for a means of access to the west side of the building. The building was originally constructed with a view to using the upper story for offices, and the contract in reference to the stairway and hall contemplated their use in the manner originally intended, and for which they were constructed. See

Cotting v. City of Boston, 201 Mass. 97, 87 N. E. 205; Union Nat. Bank of Lowell v. Nesmith, 238 Mass. 247, 130 N. E. 251, 252; Lippitt v. Weenat Shassit Ass'n, 52 R. I. 100, 157 A. 878; Mt. Holyoke Realty Corp. v. Holyoke Corp. et al., 284 Mass. 100, 187 N. E. 227.

In 17 Am. Juris., p. 995, sec. 97, it is said: "The extent of an easement is determinable by a true construction of the grant or reservation by which it is created, aided by any concomitant circumstances which have a legitimate tendency to show the intention of the parties." And in section 98 of the same volume it is said: "The use of an easement must be confined strictly to the purposes for which it was granted or reserved. A principle which underlies the use of all easements is that the owner of an easement cannot materially increase the burden of it upon the servient estate or impose thereon a new and additional burden. Alterations may not be made in the physical conditions essential to the enjoyment of the easement except as they are authorized by agreement of the dominant and servient owners."

In 19 C. J., page 907, section 94, it is said: "The determination of the extent and nature of an easement granted or reserved in express terms by deed depends upon a proper construction of the language of the instrument, from an examination of all the material parts thereof, and without consideration of extraneous circumstances, where the language is unambiguous. But as in the construction of deeds generally it is the duty of the court to ascertain and give effect to the intention of the parties, and for this purpose it may consider the situation of the property and of the parties, and the surrounding circumstances at the time the instrument was executed."

Taking into consideration the situation which existed at the time the easement was granted in the two deeds from Harris to Ross and from Ross to Harris, we think it was contemplated that the easement should continue under the situation then existing, and that it was not in-

tended to add material burdens, and to provide new situations in which it would authorize changes not contemplated by the parties at the time of the contract. In the deeds granting the easements from Harris to Ross and from Ross to Harris, it is provided that: ''Should the building on the east half of said Lot No. 5 be torn down, destroyed by fire or cyclone and another building be erected on said east half of said Lot No. 5, the said stairway and hallway are again to be restored *as the same are now* (italics ours), with like conditions for use and ingress and egress to the said second story of the said west half of said Lot No. 5.''

The situation was materially changed, and a new and greatly increased burden imposed upon the easement. The ticket window was not within the contemplation of the original lease, nor did the parties thereto contemplate the placing of a ticket window on the stairway, where persons would obstruct the passage; nor was it contemplated that numerous persons, including children and others who were not in the habit of frequenting offices, but who attend picture shows, should create a good deal of noise and disturbance in the passage way.

Furthermore, when the question was up for discussion and consideration, the alterations were consented to by Bradberry on the representation that the balcony would be entered on the west side of the building, and that the stairway would not be used for that purpose; also, that the doorway in the hall opening into the west side would be closed.

It is quite evident to us that this had a material bearing upon Bradberry's giving his consent to the alteration of the building, and the representations were important to him, and to his rights in the use of the building on the east side of the partition wall, and of the stairway, as contemplated in the beginning. See, in addition to the cases already cited, Muzio v. Erickson (1919), 41 Cal. App. 413, 182 P. 974; Brechet v. Johnson Hardware Co., 139 Minn. 436, 166 N. W. 1070, L. R. A. 1918D, 691.

For the reasons indicated, we are of the opinion that the decision of the court below was correct, and the judgment is affirmed.

Affirmed.